

Not Reported in F.Supp.                                                                 Page 1

Not Reported in F.Supp., 1997 WL 691332 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

▷
Alter v. Bogoricin
S.D.N.Y.,1997.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Hal ALTER, Plaintiff,
v.
Julio BOGORICIN, Rita Bogoricin, Claudio
Bogoricin, Julio Bogoricin Real Estate Corp., Julio
Bogoricin Real Estate Group, and Julio Bogoricin
Real Estate Co., Defendants.
**No. 97 CIV. 0662(MBM).**

Nov. 6, 1997.

Andrew P. Karamouzis, Esq., King, Pagano &
Harrison, New York, NY, for Plaintiff.
Richard M. Resnik, Esq., Mandel & Resnik, P.C.,
New York, NY, for Defendants.

OPINION AND ORDER
MUKASEY, D.J.
*1 Hal Alter sues Julio Bogoricin, Rita Bogoricin,
Claudio Bogoricin, Julio Bogoricin Real Estate
Corp. ("JBRE Corp."), Julio Bogoricin Real Estate
Group ("JBRE Group"), and Julio Bogoricin Real
Estate Co. ("JBRE Co.") for breach of contract, and
various contrived tort and statutory claims, arising
out the termination of his employment at JBRE
Corp. Defendants move to dismiss most of the
complaint under Fed.R.Civ.P. 12(b)(6) for failure to
state a claim upon which relief can be granted. For
the reasons that follow, defendants' motion is
granted in substantial part and denied in small part.

I.

The facts alleged in the complaint are accepted as
true for the purposes of this motion. *Doe v. City of
New York,* 15 F.3d 264, 266 (2d Cir.1994). Julio
Bogoricin, a resident of New York (Compl.¶ 3), is
the president and majority owner of three entities:

JBRE Corp., a New York real estate corporation;
JBRE Group, a group of real estate companies
based in Brazil and doing business in New York
and other foreign cities; and JBRE Co., a real
estate company based in Brazil and doing business
in New York. (*Id.* ¶¶ 6-8) Rita Bogoricin and
Claudio Bogoricin have ownership interests in these
three entities and assist Julio Bogoricin in their
management. (*Id* .) Julio Bogoricin, with the
assistance of Rita Bogoricin and Claudio Bogoricin,
thoroughly dominates each of these entities, ignores
corporate formalities, and commingles corporate
funds with personal funds. (*Id.*)

In April 1992, Julio Bogoricin offered plaintiff the
executive vice presidency of JBRE Corp.'s New
York office. (*Id.* ¶ 15) Thereafter, in early July
1992, Julio Bogoricin and Claudio Bogoricin told
plaintiff that he would receive a "sizeable
compensation package" if he accepted the position,
including: a base monthly salary; an annual bonus;
a share of commissions; and at least a 10 percent
share of any increase in the value of JBRE Corp.'s
real estate portfolio. (*Id.*) Julio and Claudio
Bogoricin also assured plaintiff that JBRE Corp. "
liked to share" profits with employees and that
profit sharing would be a fundamental part of his
compensation. (*Id.*)

On July 13, 1992, plaintiff drafted a letter (the "
Employment Agreement") summarizing the terms
of his employment and compensation. (*Id.* ¶ 17;
Resnik Aff., Ex. A) The Employment Agreement
provided that in exchange for "overseeing activities
of [JBRE Corp.] and other interests of [JBRE
Group]" plaintiff would receive: (1) a base salary
of $7,500 per month, adjustable for inflation; (2) an
annual bonus equal to one month's salary; (3) 10
percent of any commissions received by JBRE
Group or JBRE Co. as a result of any business
generated by JBRE Corp.; and (4) profit sharing "
in the range of 10% but according to a formula yet
to be determined." (Compl. ¶ 17; Resnik Aff.,
Ex. A) The Employment Agreement provided also

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 2

Not Reported in F.Supp., 1997 WL 691332 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

that plaintiff would receive paid vacation leave and that, unless his employment was terminated for cause, he was entitled to six months notice before termination. (*Id.*) Both plaintiff and Claudio Bogoricin, on behalf of JBRE Corp., signed the Employment Agreement.

**\*2** From July 1992 through January 1996, JBRE Corp. made substantial financial gains that, plaintiff alleges, were due largely to his efforts. (Compl.¶ 18) These gains generated commissions for both JBRE Group and JBRE Co., and resulted in an increase in the value of JBRE Corp.'s real estate holdings. (*Id.* ¶¶ 18-19) However, during the course of plaintiff's employment, Julio Bogoricin and JBRE Corp. consistently failed to make either incentive compensation or profit sharing payments to plaintiff. (*Id.* ¶ 20) They failed also to provide plaintiff with documentation proving that plaintiff was not entitled to these payments, but simply told him that such payments were not due or owing. (*Id.*)

In December 1996, Julio Bogoricin instructed the payroll administrator at JBRE Corp. to withhold plaintiff's December salary and his yearly bonus. (*Id.* ¶ 21) When plaintiff arrived at work on January 22, 1997, an attorney for Julio Bogoricin barred him from entering his office and informed him that his employment with JBRE Corp. was suspended immediately. (*Id.* ¶ 22) Plaintiff was not allowed to return to his office to retrieve his personal property. (*Id.*) Julio Bogoricin officially fired plaintiff on January 31, 1997, shortly after plaintiff filed the present action. (*Id.* ¶ 23; Resnik Aff. Ex. B) On February 6, 1997, Julio Bogoricin and JBRE Corp. remitted three payrolls checks to plaintiff totalling $8,273.91. (Compl.¶ 24) Additional facts will appear below, as necessary.

Plaintiff filed the initial complaint in this action on January 31, 1997 and an amended complaint on April 11, 1997.[FN1] He alleges eight claims arising out of the termination of his employment: (1) breach of contract; (2) breach of an implied covenant of good faith and fair dealing; (3) fraud; (4) quantum meruit and unjust enrichment; (5) tortious interference with contract; (6) violation of § 198 of the New York Labor Law; (7) violation of § 4305 of the New York Insurance Law; and (8)

conversion. (*Id.* ¶¶ 27-74, 81-84) In addition, plaintiff asks the court to order an accounting of " all monies due and owing to him" (*id.* ¶ 78) and to impose a constructive trust on defendants' funds in a corresponding amount. (*Id.* ¶¶ 75-80) Defendants move to dismiss the first cause of action in part and the second through seventh causes of action in their entirety. (Def.Mem.) In addition, defendants contend that plaintiff is not entitled to an accounting or to the imposition of a constructive trust. (*Id.* at 31-34)

> FN1. Hereinafter, all references to the " complaint" are to the amended complaint.

II.

Before addressing the merits of defendants' motion, it is necessary to consider two threshold issues. First, defendants contend that this court does not have subject matter jurisdiction over plaintiff's claims. (Def. Mem. at 7 n.4; Def. Reply Mem. at 2-3) Plaintiff brings this action in federal court pursuant to 28 U.S.C. § 1332(a)(1) alleging diversity of citizenship among the parties and an amount in controversy in excess of $75,000. (Compl.¶ 11) Defendants do not dispute the diversity of the parties. Rather, defendants argue that once I have properly ruled on their motion to dismiss, plaintiff's remaining claims will amount at most to $52,500, a sum below the jurisdictional threshold. (Def. Mem. at 7 n.4)

**\*3** Defendants' misread the law of diversity jurisdiction. In a diversity case, the court determines the amount in controversy based on plaintiff's allegations "at the time the action is commenced,"*Tongkook America, Inc. v. Shipton Sportswear Co.,* 14 F.3d 781, 784 (2d Cir.1994), and generally not after a subsequent change such as partial dismissal or summary judgment. *Id.; see also* 15 James Wm. Moore et al., *Moore's Federal Practice* ¶ 102.104(3) (3rd ed.1997) (if diversity jurisdiction existed at time case was filed, it is not affected by dismissal of one or more claims, even though amount recoverable on remaining claims falls below jurisdictional requirement). Even when a plaintiff's allegations leave "grave doubt about the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 3

Not Reported in F.Supp., 1997 WL 691332 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

likelihood of recovery of the requisite amount," *Zacharia v. Harbor Island Spa, Inc.,* 684 F.2d 199, 202 (2d Cir.1982), dismissal is not warranted unless it appears " 'to a legal certainty that the claim is really for less than the jurisdictional amount ....' ' *Tongkook,* 14 F.3d at 784 (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 289, 58 S.Ct. 586, 82 L.Ed. 845 (1938)); *see also Pariente v. Scott Meredith Literary Agency, Inc.,* 771 F.Supp. 609, 614 (S.D.N.Y.1991). Thus, a party invoking federal jurisdiction bears the burden of proving to a "reasonable probability" that the amount in controversy exceeds the jurisdictional minimum. *Tongkook,* 14 F.3d at 784.

Based on the claims for relief alleged in the complaint, I cannot say to a legal certainty that the amount in controversy is really less than $75,000. Plaintiff contends that defendants owe him at least seven months salary-at a rate of $7,500 per month-plus a percentage of commissions and profits. (Com pl.¶ 30-33) Plaintiff contends further that this unpaid compensation amounts to over $1 million. (Compl.¶ 34) However doubtful plaintiff's chances of recovering that sum may be, defendants cannot divest this court of jurisdiction it otherwise has through a motion to dismiss under Rule 12(b)(6). *St. Paul Mercury,* 303 U.S. at 289-90 (events subsequent to filing of action do not oust federal courts of jurisdiction); *see also Tongkook,* 14 F.3d at 785 (if damages are uncertain, "doubt should be resolved in favor of plaintiff's pleadings"). Accordingly, because I find to a reasonable probability that plaintiff's claims exceed the jurisdictional minimum, this court has subject matter jurisdiction.

The second threshold issue is choice of law. The Employment Agreement does not specify the law that is to govern disputes between the parties, and it is unclear where the parties entered into that agreement. However, the parties rely exclusively on New York law, and neither suggests that another jurisdiction may have a more significant interest in this dispute. *See Brink's Ltd. v. South African Airways,* 93 F.3d 1022, 1030 (2d Cir.1996), *cert. denied,*519 U.S. 1116, 117 S.Ct. 959, 136 L.Ed.2d 845 (1997) (under New York choice of law analysis, "law of the jurisdiction with the most

significant interest" in dispute controls). Thus, " [u]nder the principle that implied consent to use a forum's law is sufficient to establish choice of law," *Tehran-Berkeley Civil & Envtl. Engs. v. Tippetts-Abbett-McCarthy-Stratton,* 888 F.2d 239, 242 (2d Cir.1989), I will apply New York law here.

### III.

*4 Defendants move to dismiss seven of plaintiff's eight causes of action on the ground that they fail to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) may be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The court must take the facts alleged in the complaint as true and draw all reasonable inferences in the favor of the plaintiff. *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.,* 32 F.3d 697, 699-700 (2d Cir.1994).

On a motion to dismiss, a court generally may not consider the contents of documents that are extraneous to the complaint. *See, e .g., North American Dev., Inc. v. Shahbazi,* No. 95-4803, 1996 WL 306538, at *5 (S.D.N.Y. June 6, 1996). However, when a plaintiff fails to attach or to incorporate by reference a document that is integral to the complaint and upon which the plaintiff heavily relies, the court may take that document into account in deciding a motion to dismiss. *International Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47-48 (2d Cir.1991), *cert. denied,*503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992) (if plaintiff had actual notice of document at issue and relied upon it, no need to convert motion to dismiss into motion for summary judgment); *see also Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3rd Cir.1993), *cert. denied,*510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994) (if court does not consider dispositive document, "a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach [the]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 4

Not Reported in F.Supp., 1997 WL 691332 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

document"). Here, plaintiff has failed to attach to his complaint a copy of the Employment Agreement. However, because plaintiff relies heavily on its terms-which he drafted himself-and because those terms are integral to this dispute, I will consider the Employment Agreement in ruling on the present motion.

### A. Breach of Contract

Plaintiff's first claim is that defendants are in breach of the Employment Agreement because they: withheld incentive, profit sharing, and salary payments; withheld vacation benefits; failed to give him six months notice prior to termination; and terminated him without cause. (Compl.¶ 30-33) Defendants seek partial dismissal of this claim on two grounds.

### 1. Sufficiency of Plaintiff's Alter Ego Allegations

Defendants assert that plaintiff had a contractual relationship *only* with JBRE Corp., and that therefore this claim can be dismissed as to all other defendants. (Def. Mem. at 9-11) Although plaintiff acknowledges that he entered into the Employment Agreement with JBRE Corp. (Compl. ¶ 17), he argues that all other defendants are parties to that agreement because JBRE Corp. is merely the "alter ego" of the other defendants. (Pl. Mem. at 11-12)

**\*5** New York courts are generally reluctant to rely on a claim that a corporation is the alter ego of its principals as a basis for piercing the corporate veil. *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.,* 909 F.2d 698, 703 (2d Cir.1990) (citing *Gartner v. Snyder,* 607 F.2d 582, 586 (2d Cir.1979) . A party seeking to pierce the veil must "make a two-part showing: (i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *American Fuel Corp. v. Utah Energy Dev. Co.,* No. 96-7970, 1997 WL 491621, at \*3 (2d Cir. Aug.25, 1997); *see also Morris v. New York State Dept. of*

*Taxation and Finance,* 82 N.Y.2d 135, 141, 603 N.Y.S.2d 807, 810-11, 623 N.E.2d 1157 (1993). Because it is not necessary to allege fraud in order to pierce the corporate veil, plaintiff's alter-ego allegations are judged by the liberal notice pleading standards of Fed.R.Civ.P. 8(a) rather than the more stringent pleading standards of Fed.R.Civ.P. 9(b). *See Citicorp Int'l Trading Co. v. Western Oil & Refining Co.,* 771 F.Supp. 600, 608 (S.D.N.Y.1991).

Defendants contend that plaintiff has failed to satisfy either prong of this test. However, it is unnecessary to determine whether plaintiff has met the first prong because, even under the liberal pleading standards of Rule 8(e), plaintiff has failed to meet the second prong. *See Morris,* 82 N.Y.2d at 142-43, 603 N.Y.S.2d at 811, 623 N.E.2d 1157 (unnecessary to reach first prong when second prong not satisfied). Under the second prong, plaintiff must allege facts sufficient to establish that defendants "misused the corporate form for [their] personal ends so as to commit a wrong or injustice against" him. *Id.,* 82 N.Y.2d at 143, 603 N.Y.S.2d at 811, 623 N.E.2d 1157. In other words, plaintiff must establish a relationship between the alleged wrong against him and defendants' alleged abuse of the corporate form. *See American Fuel Corp.,* 122 F.3d 130, 1997 WL 491621, at \*6 (plaintiff "failed as a matter of law to show the use of the corporate form for a wrongful or fraudulent purpose"). Plaintiff has failed to assert facts that would establish such a relationship in this case.

Read liberally, the complaint demonstrates only that plaintiff entered into a contract with a closely held corporation which is controlled by one or more equity owners who make employment decisions for the corporation. Although plaintiff contends that Julio Bogoricin "ignored corporate formalities, diverted corporate resources and commingled [personal] funds" in his dealings with JBRE Corp., he does not allege that any of these abuses of the corporate form led to a violation of the Employment Agreement. For example, plaintiff does not allege that any of the defendants: furthered their personal interests, rather than those of JBRE Corp., by hiring and then terminating him; misled him into believing that he was entering into an employment agreement with them in their personal capacities; or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 5

Not Reported in F.Supp., 1997 WL 691332 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

failed to invest JBRE Corp. with funds sufficient to pay him.

**\*6** In short, plaintiff has not established that the wrong allegedly committed against him-the breach of contract-is related to any misuse of the corporate form. *See Mass v. McClenahan,* 893 F.Supp. 225, 234 (S.D.N.Y.1995) (in employment termination case, no reason to pierce corporate veil when defendant did not act in furtherance of his personal interest or mislead employee). In essence, plaintiff seeks to convert a breach of contract claim against his former employer, JBRE Corp., into multi-party litigation based solely on the unexceptional fact that in closely held corporations the owners typically make the employment decisions. Accordingly, the breach of contract claim is dismissed as to all defendants except JBRE Corp.

### 2. *The Profit-Sharing Provision*

Defendants contend also that the breach of contract claim should be dismissed against JBRE Corp. to the extent that it alleges a violation of the profit sharing provision of the Employment Agreement. The Employment Agreement provides that "[p]rofit sharing shall be in the range of 10% but according to a formula yet to be developed, including the determination of accrued value in the event of termination." (Resnik Aff., Ex. A) Defendants argue that this provision is only an "agreement to agree" and therefore unenforceable. (Def. Mem. at 12-13)

Under the "definiteness doctrine," New York courts will not enforce a material contract term if it is impossible to determine "what in fact the parties have agreed to ...."*166 Mamaroneck Ave. Corp. v. 151 East Pond Road Corp.,* 78 N.Y.2d 88, 91, 571 N.Y.S.2d 686, 687, 575 N.E.2d 104 (1991) (citation omitted); *see also Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher,* 52 N.Y.2d 105, 109, 436 N.Y.S.2d 247, 249, 417 N.E.2d 541 (1981) ("definiteness as to material matters is of the very essence in contract law"). Thus, " 'a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable." ' *166 Mamaroneck,* 78 N.Y.2d at 91, 571 N.Y.S.2d at

687, 575 N.E.2d 104 (quoting *Martin,* 52 N.Y.2d at 109, 430 N.Y.S.2d at 249). A compensation clause is sufficient and enforceable only if the amount of compensation can be determined "in accordance with the terms of the agreement without any further expression by the parties." *Benevento v. RJR Nabisco, Inc.,* No. 89-6266, 1993 WL 126424, at \*5 (S.D.N.Y. Apr.1, 1993).

New York courts refuse to apply the definiteness doctrine rigidly, however. *166 Mamaroneck,* 78 N.Y.2d at 91, 571 N.Y.S.2d at 687, 575 N.E.2d 104 . "Thus, where it is clear from the language of an agreement that the parties intended to be bound and there exists an objective method for supplying a missing term, the court should endeavor to hold the parties to their bargain." *Id.* 78 N.Y.2d at 91, 571 N.Y.S.2d at 688, 575 N.E.2d 104 (citation omitted). In *Martin,* the Court of Appeals recognized two situations in which a court could attach a definite meaning to an otherwise indefinite term: (1) if the agreement contained "a methodology for determining [the missing term] ... within the four corners of the [agreement]," or (2) if the agreement "invited recourse to an objective extrinsic event, condition or standard on which the amount was made to depend." 52 N.Y.2d at 110, 436 N.Y.S.2d at 250-51, 417 N.E.2d 541; *see also 166 Mamaroneck,* 78 N.Y.2d at 92-93, 571 N.Y.S.2d at 688, 575 N.E.2d 104 (concluding that lease provision providing for arbitration to determine rental price was enforceable because it established a method for calculation).

**\*7** In this case, the Employment Agreement-which plaintiff drafted himself-does not specify the share of profit plaintiff is to receive. It provides only that such share "shall be in the range of 10% ...." More important, it leaves the precise determination of this share to a future "formula yet to be developed...." This statement strongly suggests that the parties left the profit sharing provision to future negotiations, particularly when one considers the precision with which the Employment Agreement addresses other terms of plaintiff's compensation. Moreover, the Employment Agreement neither contains a methodology for developing a profit sharing formula nor refers to an extrinsic standard, event or condition from which such a formula could be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 6

Not Reported in F.Supp., 1997 WL 691332 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

calculated. *See Martin,* 52 N.Y.2d at 110, 436 N.Y.S.2d at 251, 417 N.E.2d 541. Accordingly, even drawing all reasonable inferences in favor of plaintiff, I find that, by its very design, the profit sharing provision is an agreement to agree and therefore unenforceable under a breach of contract theory.

### B. *Breach of an Implied Covenant of Good Faith and Fair Dealing*

Plaintiff's second claim alleges a breach of an implied covenant of good faith and fair dealing. Plaintiff bases this claim on allegations that defendants failed to provide him with financial records that would have allowed him to calculate his incentive compensation and profit sharing payments, and barred him from entering his office after his termination. (Compl.¶ 39, 41-42) Defendants move to dismiss this claim on the ground that it duplicates the breach of contract claim. (Def. Mem. at 14-16; Reply at 7-8)

New York courts recognize an implied covenant of good faith and fair dealing in every contract. *Apfel v. Prudential-Bache Securities, Inc.,* 183 A.D.2d 439, 439, 583 N.Y.S.2d 386, 387 (1st Dep't 1992), *modified on other grounds and affirmed,*81 N.Y.2d 470, 660 N.Y.S.2d 433 (1993). This covenant ensures that "neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract ...."*M/A-COM Sec. Corp. v. Galesi,* 904 F.2d 134, 136 (2d Cir.1990) (per curiam). However, the covenant of good faith and fair dealing is not distinct from the underlying contract, *see Geler v. National Westminster Bank USA,* 770 F.Supp. 210, 215 (S.D.N.Y.1991), and therefore, "[a]s a general rule, '[t]he cause of action alleging breach of good faith is duplicative of a cause of action alleging breach of contract ....' " *OHM Remediation Servs. Corp. v. Hughes Environmental Systems, Inc.,* 952 F.Supp. 120, 124 (S.D.N.Y.1997) (quoting *Apfel,* 183 A.D.2d at 439, 583 N.Y.S.2d at 387); *see also Canstar v. J.A. Jones Constr. Co.,* 212 A.D.2d 452, 453, 622 N.Y.S.2d 730, 731 (1st Dep't 1995) ("[A] breach of an implied covenant of good faith and fair dealing is

intrinsically tied to the damages allegedly resulting from a breach of the contract."). In fact, one court in this district recently has observed that every court faced with a complaint brought under New York law and alleging both breach of contract and breach of a covenant of good faith and fair dealing has dismissed the latter claim as duplicative. *See W.S.A., Inc. v. ACA Corp.,* Nos. 94-1868, 94-1493, 1996 WL 551599, at *9 (S.D.N.Y. Sept. 27, 1996), *modified on other grounds on reconsideration,*1996 WL 735508 (Dec. 20, 1996) (Haight, J.).

*\*8 Plaintiff acknowledges the general rule against duplicative claims. (Pl. Mem. at 12) He seeks to avoid its application on the ground that defendants committed "separate and distinct wrongful acts" by: (1) refusing to provide financial documents pertaining to his compensation; (2) concealing of financial information and documents; and (3) barring him from entering his office to retrieve his personal belongings. (*Id.* at 13-14) Plaintiff contends that these three acts support a separate claim for breach of an implied covenant of good faith and fair dealing.

This contention is unpersuasive. With respect to the first two of these acts, the relief sought by plaintiff "is intrinsically tied to the damages allegedly resulting from [the] breach of contract ." *Canstar,* 212 A.D.2d at 453, 622 N.Y.S.2d at 731. That is, the damages plaintiff seeks as a result of defendants' alleged failure to turn over financial information is identical to the damages he seeks for the alleged breach of contract-in both instances, unpaid compensation. That plaintiff did not allege withholding or concealment of financial information in the breach of contract portion of his complaint does not mean that those acts support a separate claim for breach of an implied covenant of good faith. *See W.S.A., Inc.,* 1996 WL 551599, at *9 (bifurcating breach of contract allegations does not create two separate causes of action).

The third alleged "act"-barring plaintiff from entering his office-also fails to state a claim for breach of an implied covenant of good faith and fair dealing. To the extent this "act" is intended to show that defendants violated the Employment Agreement by refusing to allow plaintiff to come to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 7

Not Reported in F.Supp., 1997 WL 691332 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

work, it duplicates the breach of contract claim. To the extent that this "act" is intended to show that defendants wrongfully refused to allow plaintiff to retrieve his property *after* firing him, it treats events outside the employment contract and essentially restates plaintiff's claim for conversion. In either case, the act of barring plaintiff from entering his office does not give rise to a separate, cognizable claim for breach of the implied covenant of good faith and fair dealing. Accordingly, plaintiff's claim that defendants violated an implied covenant of good faith and fair dealing is dismissed.

### C. *Fraud*

Plaintiff's third claim is for fraud and deceit. He alleges that defendants fraudulently induced him to enter into the Employment Agreement, and fraudulently concealed financial information from [him] in order to avoid paying his compensation and to "induce him to continue to expend his best efforts" at JBRE Corp. (*Id.* ¶ 45-50) Defendants move to dismiss this claim on the grounds that it fails to satisfy the special pleading requirements of Fed.R.Civ.P. 9(b) and duplicates the breach of contract claim. (Def. Mem. at 17-23) Although it is arguable whether plaintiff's allegations satisfy Rule 9(b), there is no need to address this issue. Even if fraud has been pleaded with sufficient particularity, plaintiff has failed to establish that the alleged fraud gives rise to a separate cause of action.

**\*9** As a general rule, "no cause of action for fraud is stated or exists where the only fraud charged relates to a breach of the employment contract." *Dalton v. Union Bank of Switzerland,* 134 A.D.2d 174, 176, 520 N.Y.S.2d 764, 766 (1st Dep't 1987). (Pl. Mem. at 16) However, as plaintiff points out (Pl. Mem. at 16), New York courts allow a litigant simultaneously to maintain a fraud and a breach of employment contract claim provided he either: "(i) demonstrate[s] a legal duty separate from the duty to perform under the contract ... or (ii) demonstrate[s] a fraudulent misrepresentation collateral or extraneous to the contract." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 20 (2d Cir.1996). Plaintiff does not contend that defendants owed him a

separate duty outside the contract. Rather, he contends that, because the profit-sharing provision of the Employment Agreement is not enforceable, defendants' promises regarding profit sharing constitute a "collateral oral agreement" that fraudulently induced him to enter into the Employment Agreement. (Pl. Mem. at 17) *See OHM Remediation Servs. v. Hughes Envtl.,* 952 F.Supp. 120, 123 (N.D.N.Y.1997) (fraud claim permissible if based on "an agreement not integrated into the contract at issue, such as a collateral oral agreement").

This argument has two fundamental flaws. First, it collapses the issues of collateralness and enforceability. A "collateral agreement" is one that is extraneous to the terms of the contract. *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d at 20. However, the subject of profit sharing was explicitly incorporated into the terms of the Employment Agreement. Simply because it was incorporated in such a way as to render it unenforceable does not make profit sharing, or the negotiation leading up to the Employment Agreement, the subject of a "collateral agreement." The second flaw in plaintiff's argument is that he drafted the Employment Agreement himself. His claim that he was fraudulently induced by pre-contractual promises is defeated by the stark fact that it was within his power to incorporate those promises-in enforceable terms-into the Employment Agreement. His failure to do so reflects either his own inconvenient candor or his lack of foresight, but not fraud.

For similar reasons, plaintiff's contention that defendants withheld financial documentation while he was employed at JBRE Corp. also fails to state a separate claim for fraud. To the extent that plaintiff alleges that defendants fraudulently avoided their payment obligations, this claim is redundant to the breach of contract claim. To the extent that plaintiff alleges that defendants fraudulently induced him "to continue to expend his best efforts" at JBRE Corp., he has not alleged that he sustained any separate damages not recoverable under his breach of contract claim. *See R.H. Damon & Co. v. Softkey Software Prods. Inc.,* 811 F.Supp. 986, 992 (S.D.N.Y.1993) (fraud claim not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 8

Not Reported in F.Supp., 1997 WL 691332 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

separately maintainable where plaintiff does not " allege that [he] sustained damages in addition to those [he] could have anticipated in the event of a breach"). Accordingly, plaintiff's third cause of action alleging fraud and deceit is dismissed.

### D. *Quantum Meruit and Unjust Enrichment*

**\*10** In his fourth claim for relief, plaintiff alleges that defendants have been unjustly enriched because they have "reaped the economic benefits of [his] substantial work and efforts" without adequately compensating him with a yearly bonus, vacation benefits, incentive compensation payments, or profit sharing payments. (Compl.¶ 57) Defendants move to dismiss this claim on the ground that the doctrines of quantum meruit and unjust enrichment are not available when the parties have executed an express contract. (Def. Mem. at 23-24)

The equitable doctrines of quantum meruit and unjust enrichment are related. Quantum meruit, which means "as much as he deserves," is based on the concept that " 'no one who benefits by the labor and materials of another should be unjustly enriched thereby ....' " *'Allstate Ins. Co. v. Administratia Asigurarilor De Stat,* 948 F.Supp. 285, 312 (S.D.N.Y.1996) (quoting *Black's Law Dictionary* 1119 (5th Ed.1979)). Thus, a claim of quantum meruit is the means by which an unjust enrichment is remedied. *See Allstate,* 948 F.Supp. at 312. Both doctrines are quasi-contractual in nature and apply only in the absence of an express agreement. *See, e.g., Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190 (1987). Thus, "the existence of a valid and enforceable written contract governing a particular subject matter" generally precludes recovery on a theory of quantum meruit or unjust enrichment for events arising out of the same subject matter. *Randall v. Guido,* 655 N.Y.S.2d 527, 528 (App. Div. 1st Dep't 1997).

With respect to his right to compensation other than profit sharing, plaintiff's attempt to avoid this general rule is unavailing. He points out that Fed.R.Civ.P. 8(e)(2) permits a litigant to assert inconsistent theories of recovery and that therefore

a party may "sue on a contract and at the same time alternatively repudiate the agreement and seek recovery on a quantum meruit claim ...." 5 Charles Allen Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1283, at 535-37 (1990). The defect in the plaintiff's argument is that nowhere in his complaint does he repudiate the Employment Agreement. Indeed, with the exception of plaintiff's right to a share of the profits, there is no dispute that the terms of plaintiff's compensation are governed by the express provisions of the Employment Agreement. *Compare* Compl. ¶ 61 ( "the Employment Agreement has been and continues to be a valid, binding contract in full force and effect") *with* Def. Mem. at 24 (defendants "do not dispute that there is an Employment Agreement governing ... the present action"). Plaintiff cannot circumvent those otherwise valid provisions by invoking the quantum meruit doctrine as an alternative theory of recovery.

With respect to his right to profit sharing, plaintiff's quantum meruit claim stands on a different footing. As discussed above, the profit sharing provision of the Employment Agreement is too indefinite to be enforced under a breach of contract theory. In similar circumstances, New York courts have suggested that a wrongfully terminated employee may pursue a quasi-contract claim for unpaid profit sharing at the same time that he seeks salary benefits under a breach of contract theory. *See Varney v. Ditmars,* 217 N.Y. 223, 232, 111 N.E. 822 (1916) (dictum); *Hardy v. Erickson,* 36 N.Y.S.2d 823, 825 (N.Y.Sup.1942); *see also Benevento,* 1993 WL 126424, at \*8 (citing *Varney* ); 1 E. Allen Farnsworth, *Farnsworth on Contracts,* § 3.30, at 371 (1990).

**\*11** In *Varney,* for example, the plaintiff, an architect employed at a weekly wage of $40, had been promised by his employer that he would " receive a fair share of [the company's] profits." 217 N.Y. at 225, 111 N.E. 822. After being discharged, the plaintiff sought to recover contractual damages in the form of unpaid salary benefits and a "fair and reasonable share" of the profits. Although the Court of Appeals concluded that a promise to share a "fair" amount of the profits was too "indefinite and uncertain" to enforce, *id.* at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1997 WL 691332 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

228, 111 N.E. 822, it stated that "if the work actually performed [by the plaintiff] was worth more than $40 per week, he ... could, on a proper complaint [alleging quantum meruit], recover its value less the amount received." *Id.* at 232, 111 N.E. 822.

Similarly, in *Hardy,* the plaintiff entered into an employment contract at a minimum salary of $500 per month for the first six months of employment and, thereafter, at "an amount as should be agreed upon between the parties." 36 N.Y.S.2d at 824. After being dismissed, plaintiff brought suit alleging that he was entitled, not only to a base salary of $500 per month, but also to the value of his services above that amount. The court upheld his claim against a motion to dismiss, stating:
The complaint sets up an existing, valid and enforceable contract for personal services. It is complete as to all terms except the additional compensation over the tentative minimum rate, and contains a provision for the fixing of that additional compensation at a later day. Assuming that it had never been fixed the plaintiff may still be permitted to recover upon quantum meruit.

*Id.* at 825.

To be sure, *Varney* and *Hardy* are not recent decisions. Yet they exemplify a court's equitable power to prevent unjust enrichment, even where the parties have a valid contract as to most of the relevant terms of compensation. Thus, if plaintiff can establish that his services at JBRE Corp. were worth more than the damages, if any, he may be able to collect under the Employment Agreement, he is entitled to prevent unjust enrichment by recovering a share of JBRE Corp.'s profits. *See* 1 Farnsworth, § 3.30, at 371 (if promise to share profits is unenforceable for lack of definiteness, employee may have restitution of reasonable value of services in excess of contract wages).

Thus, defendants' motion to dismiss plaintiff's quantum meruit claim is denied with respect to plaintiff's claim to a share of the profits in excess of any contractual damages. The motion is granted with respect to all other contract issues expressly covered by the Employment Agreement. Further,

because plaintiff had an employment relationship only with JBRE Corp. and because he has not alleged that the other defendants received unjust enrichment that was separate or distinct from that obtained by JBRE Corp., he may pursue this quantum meruit claim only against JBRE Corp.

### E. *Tortious Interference with Employment Contract*

**\*12** Defendants move next to dismiss plaintiff's claim of tortious interference with his employment contract. Plaintiff alleges that, Julio Bogoricin, Rita Bogoricin, Claudio Bogoricin, JBRE Group and JBRE Co. "intentional[ly], malicious[ly] and willful[ly]" caused JBRE Corp. to violate the Employment Agreement by terminating plaintiff's employment. (Compl.¶ 63-64)

Under New York law, a plaintiff must allege four elements to state a claim for tortious interference with contract: "(1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach; and (4) damages." *Foster v. Churchill,* 87 N.Y.2d 744, 749-50, 642 N.Y.S.2d 583, 586, 665 N.E.2d 153 (1996). In order to state a claim for tortious interference, a plaintiff must allege facts sufficient to establish that the defendant actually interfered with the contract. *See Graal Enters. Ltd. v. Desourdy Int'l 1949 Inc.,* No. 95-0752, 1996 WL 353003, at \*7 (S.D.N.Y. June 26, 1997); *EDP Hosp. Computer Sys., Inc. v. Bronx-Lebanon Hosp. Ctr.,* 212 A.D.2d 570, 571, 622 N.Y.S.2d 557, 558 (2d Dep't 1995).

In this case, plaintiff has failed entirely to allege facts sufficient to establish that Rita Bogoricin, Claudio Bogoricin, JBRE Co.[ or JBRE Group interfered with his contractual relations with JBRE Corp. Indeed, in his memorandum of law, the only " facts" plaintiff could point to in support of this claim are those asserted in paragraphs 20-25 of the complaint, all of which relate to Julio Bogoricin's actions. (Pl. Mem. at 20) Although a district court is required to accept as true all well-pleaded allegations in deciding a motion to dismiss, it is not required to accept as true conclusory allegations for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 10

**Not Reported in F.Supp., 1997 WL 691332 (S.D.N.Y.)**
**(Cite as: Not Reported in F.Supp.)**

which there are no factual underpinnings. *See De Jesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.), *cert. denied,*519 U.S. 1007, 117 S.Ct. 509, 136 L.Ed.2d 399 (1996) ("conclusory allegations unsupported by factual assertions [fail] even the liberal standard of Rule 12(b)(6)") (quotations omitted). Plaintiff's tortious interference claim against Rita Bogoricin, Claudio Bogoricin, JBRE Co. and JBRE Group is devoid of such underpinnings.

Plaintiff's only possible claim for tortious interference is against Julio Bogoricin. Although defendants contend that Julio Bogoricin cannot be considered a "third party" to the employment contract, New York courts have permitted an employee to sue the equity owner of his corporate employer for tortious interference provided that the interference was motivated by malice toward the employee. *See Foster,* 87 N.Y.2d at 750, 642 N.Y.S.2d at 587, 665 N.E.2d 153; *Felsen v. Sol Cafe Mfg. Corp.,* 24 N.Y.2d 682, 687, 301 N.Y.S.2d 610, 614, 249 N.E.2d 459 (1969); *see also American Protein Corp. v. AB Volvo,* 844 F.2d 56, 63 (2d Cir.), *cert. denied,*488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988). The rationale behind this rule is that the immunity from suit that equity owners generally enjoy should not extend to decisions that are not made for economic reasons. *Foster,* 87 N.Y.2d at 750, 642 N.Y.S.2d at 587, 665 N.E.2d 153. In this case, plaintiff has alleged that the Julio Bogoricin acted with malice in causing JBRE Corp. to fire him. (Compl.¶ 64) Although defendants may choose to attack this bare allegation at a later evidentiary stage, the allegation-as it relates to state of mind-appears to be sufficient to withstand a motion to dismiss. *See Preferred Health Care Ltd. v. Empire Blue Cross & Blue Shield,* No. 94-9326, 1997 WL 160489, at *3, (S.D.N.Y. Apr.7, 1997); *In the Matter of Sunrise Sec. Lit.,* 793 F.Supp. 1306, 1325 (E.D.Pa.1992) (malice may pleaded generally in tortious interference claim); *cf.* Fed.R.Civ.P. 9(b) ("malice . .. may be averred generally"). Accordingly, defendants' motion to dismiss plaintiff's claim for tortious interference is granted with respect to Rita Bogoricin, Claudio Bogoricin, JBRE Co. and JBRE Group and denied with respect to Julio Bogoricin.

*F. Section 198 of New York's Labor Law*

**\*13** Defendants move to dismiss plaintiff's fifth claim alleging a violation of § 198 of New York's Labor Law. Subsection 1-a of § 198, upon which plaintiff's claim is based, provides that

[i]n any action instituted upon a wage claim by an employee ... the court shall allow such employee reasonable attorney's fees and, upon finding that the employer's failure to pay the wage required by this article was willful, an addition amount as liquidated damages equal to twenty-five percent of the total amount of the wages found to be due.

Plaintiff contends that, by withholding compensation and other benefits properly owing under the Employment Agreement, defendants are liable for attorney's fees and liquidated damages under this section. (Compl. ¶¶ 66-71; Pl. Mem. at 22-23)

There are two flaws in this argument. First, § 198 does not stand alone. It sets forth the remedies available in "actions for wage claims founded on the substantive provisions of Labor Law article 6." *Gottlieb v. Kenneth D. Laub & Co.,* 82 N.Y.2d 457, 464, 605 N.Y.S.2d 213, 217, 626 N.E.2d 29 (1993). In *Gottlieb* for example, the plaintiff alleged "only a common-law contract cause of action and a second cause of action for a 'violation of Labor Law section 198'...."*Id.* 82 N.Y.2d at 460, 605 N.Y.S.2d at 215, 626 N.E.2d 29. He did not allege a violation of the provisions of article 6. The Court of Appeals dismissed his § 198 claim, reasoning that the New York legislature intended that section to apply only when a plaintiff has brought a "wage claim" under a separate statutory provision in article 6. *Id.* 82 N.Y.2d at 463-64, 605 N.Y.S.2d at 217, 626 N.E.2d 29. In this case, as in *Gottlieb,* plaintiff has not brought a wage claim under the provisions of article 6. Accordingly, he cannot pursue the statutory remedies available for such a claim.

*Gottlieb* suggests a second fundamental flaw in plaintiff's § 198 claim. In *Gottlieb,* the Court of Appeals recognized that the Labor Law does not apply to "employees serving in an executive, managerial or administrative capacity." *Id.* 82

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 11

Not Reported in F.Supp., 1997 WL 691332 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

N.Y.2d at 461, 605 N.Y.S.2d at 216, 626 N.E.2d 29; *see*N.Y. Labor Law § 190(4-7) (McKinney 1986 & Supp.1997); *see also Cohen v. Fox-Knapp, Inc.,* 226 A.D.2d 207, 208, 640 N.Y.S.2d 554, 555 (1st Dep't 1996) ("the salary claim of an executive is not within the purview of Labor Law § 198"). In this case, the complaint states explicitly that plaintiff served as the "vice-president" of JBRE Corp.'s New York office (Compl.¶ 15), a position that gave him "full authority to act and bind [JBRE Corp.] and its subsidiaries." (*Id.* ¶ 77, 640 N.Y.S.2d 554) It is impossible to imagine how plaintiff could not be considered an executive.

Plaintiff unsuccessfully attempts to avoid this classification by arguing that, at the time of his termination, he was suspended and therefore no longer serving in an executive capacity. (Pl. Mem. at 23) It is true, as plaintiff points out, that the Appellate Division in *Cohen* held that a former executive could recover under § 198 because he was working as a salaried salesman, rather than an executive, at time of his termination. 226 A.D.2d at 208, 640 N.Y.S.2d at 555. However, nothing in the holding of that case suggests that an executive who is suspended prior to termination ought to be considered a non-executive employee for purposes of § 198. Such a reading would make the availability of § 198 contingent, not on the position held by the employee, but on the procedure used by the employer to fire him. This result "would afford a windfall remedy to litigants whom the [New York] Legislature consciously chose *not* to afford the protections and benefits of the wage payment regulatory provisions of the Labor Law."*Gottlieb,* at 465, 605 N.Y.S.2d 213, 626 N.E.2d 29, 605 N.Y.S.2d at 218. Accordingly, plaintiff's claim for attorney's fees and liquidated damages under § 198 of New York's Labor Law is dismissed.

*G. Section 4305(e)(2)(A) of New York's Insurance Law*

**\*14** Plaintiff claims that defendants violated § 4305(e)(2)(A) of New York's Insurance Law.The following additional facts, taken from the complaint, are relevant to this claim: On March 1, 1997, one month after plaintiff's termination on

January 31, 1997, JBRE Corp. sent plaintiff a letter informing him that he had the right to continue his group health insurance policy. (Compl.¶ 26) The letter provided that plaintiff had to send a written notice to JBRE Corp. of his intent to continue health insurance "within sixty days of [[[his] termination date [January 31, 1997], or complete the attached COBRA election form and return the same directly to [JBRE Corp.] prior to April 1, 1997." (*Id.* ¶ 26)

Plaintiff contends that the continuation notice sent by JBRE Corp. violated § 4305(e)(2)(A) of the Insurance Law. That section provides:
An employee ... who wishes continuation [of the group health coverage] must request such continuation in writing within the sixty day period following the later of: (i) the date of [his] termination; or (ii) the date the employee is sent notice by first class mail of the right of continuation by the group policyholder.

Plaintiff argues that, because he did not receive the continuation notice until March 1, 1997, and because that date was later than the date of his termination, he should have had sixty days from that date-or until April 30, 1997-to request continuation. However, the letter sent by JBRE Corp. stated that plaintiff had to request continuation either within 60 days from the date of his termination-that is, by March 31, 1997-or by April 1, 1997. Either way, plaintiff contends, the notice sent by JBRE Corp. was defective because it gave him only about 30 days to elect continuation of group health insurance, rather than the 60 days guaranteed by § 4305(e)(2)(A). (Pl. Mem. at 24)

Plaintiff's argument misconstrues the obligations and rights created by § 4305(e)(2)(A). First, that section is directed to employees, not employers. *See*N.Y. Insurance Law § 4305(e)(2)(A) (McKinney 1997) ("[a]n employee who wishes continuation of coverage must request ...") It does not mandate the contents of a continuation notice; it merely provides that an employee has a two-month window to respond once he receives such notice. Second, contrary to the import of plaintiff's argument, nothing in § 4305(e)(2)(A) suggests that an inaccurate continuation letter may

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                          Page 12

**Not Reported in F.Supp., 1997 WL 691332 (S.D.N.Y.)**
**(Cite as: Not Reported in F.Supp.)**

serve to reduce the time in which an employee may request continuation. The 60-day period is statutorily mandated and does not depend on the accuracy of a continuation letter.

Notably, plaintiff does not allege that the defective continuation letter misled him into believing that the statutory notice period was less than 60 days or that he had lost his right to request continuation. Indeed, plaintiff's actions belie any such allegation. Plaintiff filed his amended complaint on April 11, 1997-alleging a violation of § 4305(e)(2)(A)-19 days before the expiration of the 60 day period. Thus, I must assume that, as of the date of the amended complaint, plaintiff was aware of § 4305(e)(2)(A) and the rights conferred under that statute. His failure to request either a continuation of health coverage or an extension of time in which to request such a continuation-if there was such a failure-moots the defective notice. Accordingly, plaintiff's sixth claim alleging a violation of § 4305(e)(2)(A) of New York's Insurance law is dismissed.

IV.

**\*15** Defendants move also to dismiss plaintiff's claim for equitable relief in the form of an accounting and a constructive trust. Plaintiff alleges that he is entitled to a "full accounting [of] all monies due and owing" under the Employment Agreement and to the imposition of a constructive trust over such monies. (*Id.* ¶¶ 78-80) Defendants object to these remedies, principally on the ground that plaintiff was only an employee of JBRE Corp. and therefore not entitled to such equitable relief. (Def. Mem. at 31-34) For the reasons stated below, plaintiff's requests for these forms of relief are stricken.

A. *Accounting*

" 'The right to an accounting is premised upon the existence of confidential or fiduciary relationship and a breach of the duty imposed by that relationship respecting property in which the party seeking the accounting has an interest." ' *Adam v.*

*Cutner & Rathkopf,* 656 N.Y.S.2d 753, 759 (App. Div. 1st Dep't 1997) (quoting *Palazzo v. Palazzo,* 121 A.D.2d 261, 265, 503 N.Y.S.2d 381, 384 (1st Dep't 1986)). An accounting is unavailable when the parties have only an employee-employer relationship. *See Michnick v. Parkell Products, Inc.,* 215 A.D.2d 462, 462-63, 626 N.Y.S.2d 265, 266 (2nd Dep't 1995); *Reichert v. MacFarland Builders, Inc.,* 85 A.D.2d 767, 767, 445 N.Y.S.2d 264, 264 (3rd Dep't 1981); *see also* 1 N.Y. Jur.2d § 30, at 183 (1979).

Plaintiff's claim for an accounting founders on these principles. Although plaintiff, as a corporate officer of JBRE Corp., may have owed some fiduciary duty to the corporation, defendants did not owe plaintiff a similar duty not to fire him or to withhold his compensation. To the extent that these actions were wrongful, they were wrongful because they violated the Employment Agreement, not because defendants were "in breach of [a] duty imposed" by a fiduciary obligation owed to the plaintiff. *Adam,* 656 N.Y.S.2d at 759; *cf. Waldman v. Englishtown Sportswear, Ltd.,* 92 A.D.2d 833, 835-36, 460 N.Y.S.2d 552, 556 (1st Dep't 1983) (mere fact that employer owes money to employee does not make employer a fiduciary). That plaintiff may have expected to share some profits in the corporation does not change this conclusion. New York courts have held that an employee may not compel an accounting if, as here, the employment relationship entails only a sharing of profits, not a sharing of losses. *Reichert,* 85 A.D.2d at 767, 445 N.Y.S.2d at 265. In such a case, the employer is not considered a fiduciary of or joint venturer with the employee. *See Michnick,* 215 A.D.2d at 462-63, 626 N.Y.S.2d at 266.

The "other special circumstances" that plaintiff alleges-defendants' withholding of compensation and concealment of financial information (Compl. ¶ 20, 35; Pl. Mem. at 26)-do not justify an accounting. These circumstances establish only that defendants may have breached the Employment Agreement.

B. *Constructive Trust*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 13

Not Reported in F.Supp., 1997 WL 691332 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

**\*16** Plaintiff's request for a constructive trust fails for similar reasons. A constructive trust may not be imposed unless four elements have been established: a confidential or fiduciary relationship, a promise, a transfer made in reliance on that promise, and unjust enrichment. *In Re Koreag, Controle Et Revision, S.A.,* 961 F.2d 341, 352 (2d Cir.), *cert. denied,* 506 U.S. 865, 113 S.Ct. 188, 121 L.Ed.2d 132 (1992). Thus, a constructive trust is generally not available in the absence of a breach of fiduciary duty. *See Smallwood Estates, Inc. v. Nikola,* 163 A.D.2d 763, 764, 558 N.Y.S.2d 725, 726 (3d Dep't 1990); *see also* 106 N.Y. Jur.2d § 163, at 207 (constructive trust imposed where "by virtue of a fiduciary relationship, one has obtained property in derogation of his duties as" fiduciary).
As noted, plaintiff has failed to allege a breach of fiduciary duty.

Plaintiff contends that New York courts have not applied the fiduciary requirement rigidly. *See In Re Koreag,* 961 F.2d at 353. Perhaps. But, it is equally true that the constructive trust is an equitable doctrine that applies only when equity so demands. *Id.* at 352. Under the circumstances of this case, in which plaintiff is protected from any unjust enrichment under a theory of quantum meruit and in which the gravamen his claim is a simple common-law breach of contract, there is no reason to impose a constructive trust on assets of defendants.

3

For the above reasons, defendants' motion to dismiss is granted as to the following claims: breach of covenant of good faith and fair dealing, fraud, violation of § 198 of New York's Labor Law, and violation of § 4305 of New York's Insurance Law.Defendants' motion for partial dismissal of the breach of contract claim is also granted. Defendants' motion to dismiss plaintiff's claims for quantum meruit and tortious interference with contract is granted in part and denied in part. Finally, plaintiff's requests for equitable relief in the form of an accounting and a constructive trust are stricken.

SO ORDERED:

S.D.N.Y.,1997.
Alter v. Bogoricin
Not Reported in F.Supp., 1997 WL 691332 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1837366 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

**c**
Ross v. FSG PrivatAir, Inc.
S.D.N.Y.,2004.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Stephen M. ROSS, Plaintiff,
v.
FSG PRIVATAIR INC. d/b/a Privatair Defendant.
**No. 03 Civ. 7292(NRB).**

Aug. 17, 2004.

MEMORANDUM and ORDER
BUCHWALD, J.
*1 Plaintiff Stephen M. Ross ("plaintiff" or "Ross") initiated this action against defendant FSG PrivatAir Inc., d/b/a PrivatAir ("defendant" or " PrivatAir") claiming, through an Amended Complaint, breach of contract, breach of fiduciary duty and negligence, all related to Ross's prospective but ultimately unconsummated purchase of an aircraft from a third-party, Grafair. Defendant essentially acted as plaintiff's agent [FN1] in the failed transaction, and has now moved to dismiss plaintiff's Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6) on various grounds, including plaintiff's supposed failure to state a claim for any of his three causes of action. Additionally, defendant claims that in this suit plaintiff is advocating certain positions of law and fact that are inconsistent with those plaintiff advanced in prior related litigation, and as such plaintiff should be sanctioned pursuant to Fed.R.Civ.P. 11. For the reasons that follow, defendant's motion to dismiss is granted in part and denied in part, and its motion for Rule 11 sanctions is denied.

FN1. *Seeinfra* note 2.

For purposes of this motion, the following facts,

drawn from plaintiff's Amended Complaint unless otherwise noted, are taken as true, and all inferences are drawn in plaintiff's favor. *SeeBurnett v. Carothers,* 192 F.3d 52, 56 (2d Cir.1999).

A. *The Failed Aircraft Purchase.*

In or about 2001, plaintiff Ross, a New York resident, and defendant PrivatAir, a Delaware corporation with its principal place of business in the Connecticut, entered into an agreement whereby PrivatAir would act as Ross's agent [FN2] in connection with Ross's prospective purchase of an aircraft in exchange for a commission if the purchase was consummated. At all times relevant to this agreement, PrivatAir held itself out as an expert in aircraft purchases and sales and the contract negotiations accompanying such transactions. According to Ross, he relied on this expertise in entering into his agreement with PrivatAir.

> FN2. Ross alleges that PrivatAir was his agent. On a motion to dismiss, the Court need not credit legal conclusions included in a complaint's factual allegations. For purposes of this factual background, we refer to PrivatAir as Ross's "agent" only in a generic and not a legal sense. *See Papasan v. Allain,* 478 U.S. 265, 286 (1986) ("Although for the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation." )

On behalf of Ross, PrivatAir located and negotiated the purchase of a used 1981 Challenger 600 aircraft (the "Aircraft") owned by Grafair, a Florida corporation. An Aircraft Purchase Agreement (the " Grafair Agreement") drafted by PrivatAir codifying the transaction was entered into by Ross and Grafair

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 1837366 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

on October 29, 2001. *See* Am. Compl., Ex. A. At some unspecified point, PrivatAir represented to Ross that the Grafair Agreement was PrivatAir's " standard purchase agreement." *See* Am. Compl., ¶ 13.

Ross placed into escrow a $100,000 deposit on the Aircraft. Upon satisfaction of all applicable terms and conditions in the Grafair Agreement, Ross was to purchase the Aircraft for $6,650,000. The Grafair Agreement reserved to Ross prior to closing the right to inspect the Aircraft at his own expense. It is Ross's contention that PrivatAir represented to him that pursuant to the terms of the Grafair Agreement Ross could terminate the Grafair Agreement after inspection for any or no reason. Ross further contends that if he chose to terminate, he would be refunded $85,000 of his deposit, and the $15,000 balance would be remitted to Grafair to cover the expense of relocating the Aircraft for inspection.

**\*2** The inspection uncovered problems with the Aircraft itself and its regulatory paperwork. After the inspection, PrivatAir, allegedly without Ross's authorization or knowledge, urged Grafair to undertake certain repairs of the Aircraft. Ross, however, in light of the inspection results, elected to terminate the Grafair Agreement. Grafair, in response, claimed that the Ross had no right to repudiate because the Grafair Agreement did not provide Ross such a right and because of PrivatAir's post-inspection statements encouraging Grafair to repair the Aircraft. Grafair took the position that Ross would be in breach of contract if he did not complete the purchase.

### B. *The Florida Lawsuit.*

The contract dispute between Ross and Grafair prompted an interpleader action by the deposit's escrowee against the two transacting parties in Oklahoma state court. That action was removed to the United States District Court for the Western District of Oklahoma, and then transferred to the Southern District of Florida. *SeeInsured Aircraft Title Service, Inc. v. Stephen M. Ross and Grafair, Inc.,* 02-14081-Civ (S.D.Fla.) (the "Florida Lawsuit" ).

Ross and Grafair cross-claimed against each other in the Florida Lawsuit, the former alleging it had a right to terminate the Grafair Agreement, the latter alleging it was entitled to receive the entire $100,000 deposit, as well as consequential damages flowing from Ross's breach of the Grafair Agreement. Ross's motion for judgment on the pleadings on his cross-claim against Grafair was denied. *See* Florida Lawsuit, Order of Nov. 21, 2002.[FN3]

> FN3. Ross's motion for judgment on the pleadings was not denied on the merits, but instead because Grafair had not yet filed an answer to Ross's cross-claims. *Seeid.,* ¶ 5. In the Order, discovery was ordered completed by December 30, 2002, and a cutoff date of January 15, 2003 was set for dispositive motions. *Id.,* at ¶ 8.

Following the denial of Ross's motion, Ross and Grafair entered into a settlement which, *interalia,* provided for the escrowee's release to Grafair of the entire $100,000 deposit, and the discontinuation with prejudice of both Ross's and Grafair's cross-claims. *See* Affidavit in Support of Defendant's Motion to Dismiss of Russell J. Sweeting, Document 33 (Stipulation for Settlement). According to Ross's Amended Complaint, he entered into the settlement because the cost of discovery and trial would exceed his deposit, and to eliminate exposure to a potentially substantial verdict against him on Grafair's breach of contract cross-claims.

### C. *Ross's Claims.*

On December 31, 2003, Ross filed an Amended Complaint in this action alleging that PrivatAir committed a breach of contract, breach of fiduciary duty, and negligence in the course of negotiating and executing the Grafair Agreement. Specifically, Ross claims that PrivatAir (1) drafted an Agreement with an ambiguity preventing Ross from recovering $85,000 of the deposit; [FN4] (2) misrepresented to Ross that the Grafair Agreement permitted Ross's recovery of $85,000 of the deposit; and (3) urged

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 1837366 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Grafair, without Ross's knowledge or authorization, to make certain repairs to the Aircraft. All three of these acts and omissions of PrivatAir's are alleged to constitute a breach of contract, a breach of fiduciary duty, and negligence. Ross claims that PrivatAir is liable to him for $169,612.65 plus interest, which is the sum of the $84,612.65 he paid in legal fees and disbursements in defending against the Florida Lawsuit, as well as the $85,000 partial deposit refund he believed he was entitled to upon terminating the Grafair Agreement.[FN5] On February 6, 2004, PrivatAir moved to dismiss the Amended Complaint. Oral argument on the motion was held on June 24, 2004.

> FN4. Oddly, Ross's Amended Complaint never identifies the alleged ambiguity in the Grafair Agreement which in part gives rise to this lawsuit.
> However, the arguments of the parties in their briefing papers and clarification provided at oral argument indicates that the reference is to § 1.2(a) of the Grafair Agreement, which provides, in relevant part:
> Upon Buyer's acceptance of the Aircraft, as defined by Exhibit "B" attached, Buyer shall cause the [$100,000] deposit to be paid to Seller. The balance of the [$6,550,000.00] purchase price ... will be due and payable in immediately available U.S. funds upon delivery of the Aircraft pursuant to this Agreement.
> Exhibit "B" is a document headed " CONFIRMATION OF AIRCRAFT ACCEPTANCE". The document reads in relevant part:
> Pursuant to the Aircraft Purchase Agreement dated October 29, 2001 between Steven Ross ("Buyer") and Grafair ("Seller"), this is to confirm that Buyer has inspected the above referenced Aircraft on this date. Buyer hereby accepts the Aircraft and the deposit is nonrefundable in accordance with the terms of the Agreement subject to Seller correcting or requiring the following items[.]

No items are identified, and the signature lines for Grafair and Ross are blank.
Section 1.2(b) of the Agreement reads in full:
If buyer does not accept the aircraft, Buyer will pay Seller, from the deposit, $15,000 to cover costs of moving aircraft to and from the pre-purchase facility.
Also relevant to these provisions is the right of inspection given to Ross under the Agreement in § 2.2, which reads in relevant part:
The sale is subject to Buyer's inspection and a one-hour test flight ... to determine [if] the Aircraft conforms with the conditions specified in Section 2.1 [related to the Aircraft's airworthiness] ... Buyer shall provide Seller with a written list of discrepancies within two (2) business days after completion of said inspection. All costs and expenses for repairs in order to make the Aircraft conform with conditions set forth in Section 2.1 shall be borne by Seller.

> FN5. Although PrivatAir has not yet counter-claimed against Ross, Ross seeks also seeks a declaration that neither he nor anyone on his behalf owes PrivatAir $43,395.42 for services allegedly rendered.

I. *Standard of Review for Motion to Dismiss*

**\*3** In assessing a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the Court is obligated to accept as true all well-pleaded factual allegations in the Amended Complaint, and view them in the light most favorable to plaintiff. *SeeScheuer v. Rhodes,* 416 U.S. 232, 236;*Hertz Corp. v. City of New York,* 1 F.3d 121, 125 (2d Cir.1993). Defendant's motion is to be granted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Still v. DeBuono,* 101 F.3d 888, 891 (2d Cir.1996) (*citingConley v. Gibson,* 355 U.S. 41, 48 (1957)).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 4

**Not Reported in F.Supp.2d, 2004 WL 1837366 (S.D.N.Y.)**
**(Cite as: Not Reported in F.Supp.2d)**

### II. *Breach of Contract Claim*

According to plaintiff, he and PrivatAir entered into a contract under which plaintiff was to act as plaintiff's agent for plaintiff's purchase of an airplane, and plaintiff in turn would pay PrivatAir a commission upon purchase. *See* Am. Compl., ¶ 7-8. This contract was not reduced to writing.

Plaintiff alleges that defendant committed a breach of the contract by "(a) drafting the [Grafair] Agreement with an ambiguity that prevented Ross from recovering $85,000 of his deposit; (b) wrongly representing to Ross that the [Grafair] Agreement, as drafted, would permit him to recover $85,000 of his deposit; and (c) without Ross' knowledge or authorization, urging Grafair to proceed with certain repairs to the Aircraft."Am. Compl., ¶ 32. *See also* Am. Compl., ¶¶ 12, 15, 19.

A breach of contract claim under New York law [FN6] must establish (1) the existence of a contract; (2) plaintiff's performance on the contract; (3) defendant's breach of contract; and (4) resulting damages. *SeeRexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525 (2d Cir.1994). Additionally, where a breach of contract claim fails to denote the " essential terms of the parties' purported contract, including the specific provisions of the contract upon which liability is predicated," it will be dismissed. *SeeHighlands Ins. Co. v. PRG Brokerage, Inc.,* No. 01 Civ. 2272(GBD), 2004 WL 35439, at *8 (S.D.N.Y. Jan. 6, 2004) (*quotingSud v. Sud,* 211 A.D.2d 423, 621 N.Y.S.2d 37, 38 (1st Dep't 1995); *seealsoWindow Headquarters, Inc. v. MAI Basic Four, Inc.,* Nos. 91 Civ. 1816(MBM), 92 Civ. 5283(MBM), 1993 WL 312899 at *3 (S.D.N.Y.1993) (stating that while a "plaintiff is not required to attach a copy of the contract or to plead its terms verbatim", a complaint in a breach of contract action must nevertheless "set forth the terms of the agreement upon which liability is predicated"). Defendant challenges the viability of plaintiff's breach of contract claim, contending that plaintiff has not alleged a breach of any term of the contract. While it is clear from the face of the Amended Complaint that plaintiff enumerates certain acts and omissions of PrivatAir's alleged to comprise breaches of the contract, PrivatAir

maintains that this alleged conduct did not violate any contractual obligations actually existing between the parties. Based on Ross's recitation in the Amended Complaint of the contract's formation and terms, we agree with PrivatAir.[FN7]

> FN6. There is agreement that New York law governs the consideration of this motion.

> FN7. PrivatAir also charges that Ross's damages claim is impermissibly speculative as the Florida Lawsuit's settlement forever placed in doubt whether Ross was entitled to recoup the deposit. Because we find that plaintiff's Amended Complaint fails to allege a breach of a contract provision, we need not address the damages issue.

### A. *$85,000 of the Deposit.*

*\*4 According to Ross, he contract with PrivatAir to "act as Ross' agent in connection with the prospective purchase of an aircraft by Ross."Am. Compl., ¶ ¶ 7 and 8. PrivatAir, in turn, was to receive a commission from Ross if he ultimately purchased an aircraft. *Seeid.,* ¶ 7. Ross asserts that because his Agreement with Grafair did not ultimately result in his recovery of $85,000 of his deposit, PrivatAir breached the contract it had with Ross.[FN8]

> FN8. The Grafair Agreement specified that "[a] refundable deposit of [$100,000] has been placed in escrow" and that "[u]pon Buyer's acceptance of the Aircraft ... Buyer shall cause the deposit to be paid to Seller. The balance of the purchase price [$6,550,000.00] will be due and payable ... upon delivery of the Aircraft pursuant to this Agreement."Agreement, §§ 1.2, 1.2(a). The Grafair Agreement further provided that if Ross did not accept the Aircraft, "Buyer will pay Seller, from the deposit, $15,000 to cover costs of moving aircraft to and from the pre-purchase

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 5

Not Reported in F.Supp.2d, 2004 WL 1837366 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

facility."*Id.,* at § 1.2(b).

Ross argues that PrivatAir, both before and throughout their engagement with Ross, held itself out as an "expert in aircraft sales and acquisitions, including without limitation, in negotiating contracts for the purchase and sale of aircraft."Am. Compl., ¶ 6. Moreover, Ross claims he relied on this self-professed expertise in choosing to contract for PrivatAir's services.*Id.* at ¶ 9.

These representations, however, are not alleged to have ever matured into specific, incorporated and binding terms of its contract with Ross. Thus, at most, the results of defendant's performance were inconsistent with general representations about its expertise and competence made incident to contract formation. Even if PrivatAir is to be held to an "as advertised" standard of performance, Ross's complaints are outside the scope of PrivatAir's representations. PrivatAir's self-praise related to contract *negotiation* (i.e. locating an airworthy aircraft and securing Ross a competitive price), not contract *drafting.*[FN9]Ross faults PrivatAir for misfeasance classifiable in the latter category.

> FN9. Ross evidently understands this distinction, as in his Memorandum of Law in Opposition to Summary Judgment (" Opp.Mem.") he states "[a]s Ross' broker, PrivatAir not only found Ross an airplane, but *negotiated* the transaction with the seller on Ross' behalf and *drafted* for him a contract embodying the deal it had *negotiated.*"Opp. Mem. at 11 (emphasis added). While the two pursuits are not mutually exclusive, neither are they coterminous, or synonymous. An expert in contract negotiating is by no means necessarily an expert in contract drafting, and a skilled contract drafter might not have any aptitude for contract negotiation and bargaining.

More importantly, Ross does not allege that, as part of PrivatAir's contractual obligations, PrivatAir was to furnish Ross a aircraft purchase agreement that permitted Ross to abort the agreement after an inspection at-will and then reclaim eighty-five percent of the deposit. PrivatAir's assurances regarding Ross's right under the Grafair Agreement to recover his deposit did not concern terms of its contract with Ross susceptible to breach. Significantly, it was not until *after* Ross and PrivatAir consummated their agreement that PrivatAir is alleged to reference particular rights possessed by Ross under its prospective contract with Grafair. Specifically, Ross avers that PrivatAir located the Aircraft and negotiated a purchase and sale transaction on Ross's behalf with Grafair. *See* Am. Compl., ¶¶ 10-11. Thereafter, PrivatAir drafted the Aircraft Purchase Agreement, which was to be executed by Ross and Grafair. *See*id., ¶ 12. PrivatAir informed Ross that the drafted Agreement was PrivatAir's "standard purchase agreement," one which allowed for Ross to terminate the Grafair Agreement after inspection of the Aircraft, for any or no reason, and then recover $85,000 of his $100,000 deposit. *See*id., ¶¶ 14-15.

Any facts giving rise to an obligation on the part of PrivatAir to arrange the Aircraft purchase in a way that offered Ross an opportunity to terminate the purchase and recover the bulk of his deposit postdate the formation of the Ross/PrivatAir contract. Nor does Ross allege that his contract with PrivatAir was subsequently modified to include this obligation.[FN10]Thus, PrivatAir was under no such obligation, and PrivatAir's alleged failure to draft an agreement in this regard cannot be a breach of the contract.

> FN10. In his opposition memorandum, Ross argues that "PrivatAir advised Ross that the contract was the standard agreement used for [aircraft] purchases, and that under it he could recover $85,000 of his deposit if he chose to terminate the deal. Ross reasonably relied upon such representations in signing the [Grafair] [A]greement."Opp. Mem. at 11. Ross's Amended Complaint does not seek recovery on a theory of promissory estoppel, although this appears to be the legal basis for this particular argument. Under New York law, a cause of action for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 1837366 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

promissory estoppel requires demonstration of the following: (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance on that promise; and (3) injury to the relying party as a result of the reliance. See*Kaye v. Grossman,* 202 F.3d 611, 615 (2d Cir.2000). Ross would face the difficult task of establishing that the prospective purchaser of a $6 million aircraft reasonably relied on what amounts to legal advise from a non-lawyer.

### B. *Repairs to the Aircraft.*

**\*5** Ross also alleges that PrivatAir unauthorizedly petitioned Grafair to repair the Aircraft after Ross's inspection gave Ross reason to seek to terminate the Grafair Agreement. *See* Am. Compl., ¶¶ 18-20. Because Grafair was urged to proceed with repairs, Grafair maintained that Ross could not then back out of the sale. *Id.,* ¶ 21. Ross argues that PrivatAir's unauthorized statements to Grafair, which had the purported effect of binding Ross to purchase the Aircraft, were a breach of contract.

Ross's allegations in this regard fail to articulate an actionable breach of contract. As with Ross's claim of a breach with respect to the deposit, this allegation does not identify what term of his contract with PrivatAir was breached by these statements or their consequences. Instead, it simply assumes the described conduct was proscribed by or inconsistent with the contract. If Ross limited PrivatAir's authority to act on his behalf, the Amended Complaint should at the very least demarcate the bounds on that authority. Otherwise, there is no way for the Court to discern whether this particular act, if true, violated a provision of the contract agreed upon by the two parties.[FN11]*See Highlands Ins.,* 2004 WL 35439, at \*8;*Sud,* 211 A.D. at 424, 621 N.Y.S.2d at 38;*seealsoWindow Headquarters,* 1993 WL 312899, at \*3.

FN11. Ross cites to *William Wrigley Jr. Co. v. Waters,* 890 F.2d 594 (2d Cir.1989) for the proposition that "[i]t is well settled under New York law that negligent

performance of a contract may give rise to a claim sounding in tort as well as one for breach of contract, which may be submitted to the trier of the case alternatively", and that by acting without authority with regard to the aircraft repairs, PrivatAir did not act with reasonable skill and care. For this reason, Ross claims he need not allege the specific supposedly broken terms of his agreement with PrivatAir because PrivatAir's failure to deliver its services with appropriate competence was itself a breach. We disagree with Ross's interpretation of *Wrigley.*The case merely stands for the proposition that negligent performance of contract can sometimes constitute a tort as well as a breach of contract. We do not think this means that every negligent performance of a contract is *itself* a breach of the contract. Instead, a negligent performance of a contract might *cause* a breach of contract. Under that circumstance, a plaintiff is not relieved of its obligation to identify what term of a contract was actually breached. Moreover, plaintiff's assertion that he need not specify the terms of the agreement on which he maintains defendant's liability is directly refuted by well-settled New York law. *See Highlands Ins.,* 2004 WL 35439, at \*8;*Sud,* 211 A.D. at 424, 621 N.Y.S.2d at 38;*see alsoWindow Headquarters,* 1993 WL 312899, at \*3. To the extent Ross means to advance a breach of the term of good faith and fair dealing implied in every contract, it is subsumed by the discussion of plaintiff's breach of a fiduciary duty claim.

### III. *Breach of Fiduciary Duty Claim*

Ross asserts that "[a]s Ross's agent, PrivatAir had a fiduciary duty to Ross."Am. Compl., ¶ 35. Ross's Amended Complaint does not define what that duty was or entailed.[FN12]As discussed above, Ross elsewhere alleges that PrivatAir "held itself out to be expert in aircraft sales and acquisitions, including without limitation, in negotiating contracts for the purchase and sale of aircraft,"*id.,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 7

Not Reported in F.Supp.2d, 2004 WL 1837366 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

¶ 6, and that Ross relied on these representations in entering into its contract. *Id.,* ¶ 9. According to Ross, the same exact acts and omissions of PrivatAir's that violated the contract also constituted a breach of fiduciary duty, namely, again, "(a) drafting the [Grafair] Agreement with an ambiguity that prevented Ross from recovering $85,000 of his deposit; (b) wrongly representing to Ross that the [Grafair] Agreement, as drafted, would permit him to recover $85,000 of his deposit; and (c) without Ross' knowledge or authorization, urging Grafair to proceed with certain repairs to the Aircraft."*Id.,* ¶ 37.

> FN12. In his opposition memorandum, Ross asserts that "a broker owes fiduciary duties to his principal."Opp. Mem. at 10 (citations omitted). Nowhere in his Amended Complaint does Ross allege that PrivatAir was his broker. If being an agent is not synonymous with being a broker, then Ross's arguments about the responsibilities of a broker are an impermissible attempt to amend his complaint through a briefing memorandum. *SeeJacobson v. Peat, Marwick, Mitchell & Co.,* 445 F.Supp. 518, 526 (S.D.N.Y.1977) (stating that party may not amend pleading through statements in briefs).

Under New York law, an actionable breach of fiduciary duty claim is comprised of the existence of a fiduciary relationship and damages caused by a breach of the fiduciary duty. *See,e.g.,Cramer v. Devon Group,* 774 F.Supp. 176, 184 (S.D.N.Y.1991).

*A. Was There A Fiduciary Relationship?*

A fiduciary duty exists "when one has reposed trust or confidence in the integrity or fidelity of another who thereby gains a resulting superiority of influence over the first, or when one assumes control and responsibility over another", and " [w]hether one party is a fiduciary of another depends on the relationship between the parties."

*Reuben H. Donnelley Corp. v. Mark I Marketing Corp.,* 893 F.Supp. 285, 289 (S.D.N.Y.1995). Attorney/client or doctor/patient relationships "are sufficiently rooted in trust and confidence to trigger super-contractual fiduciary duties."*Id.* However, "a conventional business relationship does not create a fiduciary relationship in the absence of additional factors."*Id.,quotingFeigen v. Advance Capital Management Corp.,* 150 A.D.2d 281, 283, 541 N.Y.S.2d 797, 799 (1st Dep't 1989). Indeed, " [u]nder New York law, parties to a commercial contract do not ordinarily bear a fiduciary relationship to one another unless they specifically so agree," or if "one party's superior position or superior access to confidential information is so great as virtually to require the other party to repose trust and confidence in the first party."*Calvin Klein Trademark Trust v. Wachner,* 123 F.Supp.2d 731, 733-34 (S.D.N.Y.2000).

*6 It is insufficient to merely allege the existence of a fiduciary relationship. Instead, "to plead a cause of action alleging that defendants became fiduciaries, plaintiffs must allege at least some factors from which a court could conclude that such a relationship has been established."*Boley v. Pineloch Associates, Inc.,* 700 F.Supp. 673, 681 (S.D.N.Y.1988). Moreover, it is well-settled that "a simple breach of contract is not to be considered a tort unless a duty independent of the contract itself has been violated. This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 389, 521 N.Y.S.2d 653, 656-57 (1987) (citations omitted). A tort claim is barred as redundant where it is "merely a restatement, albeit in slightly different language, of the 'implied' contractual obligations asserted in the cause of action for breach of contract."*Id.* at 657.

Fiduciary obligations are not imposed on one party merely because it possesses relative expertise as compared to the other. *SeeMechigian v. Art Capital Corp.,* 612 F.Supp. 1421, 1430 (S.D.N.Y.1985) (finding that "[p]laintiff has provided no support for the proposition that mere expertise in a matter create fiduciary responsibilities, which is essentially

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 8

Not Reported in F.Supp.2d, 2004 WL 1837366 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

the sum and substance of his argument"); *see also Boley,* 700 F.Supp. 673, 681 (holding that " [a]llegations of reliance on another party with superior expertise, standing by themselves, will not suffice").

Furthermore, where the parties' contract forms both the foundation and boundary of their relationship, fiduciary responsibilities have not attached. *See Reuben H. Donnelley Corp.,* 893 F.Supp. at 290 (refusing to find a fiduciary obligation where " absent ... contractual obligations" the complained of "conduct would not be actionable"); *see also Clark-Fitzpatrick, Inc.,* 521 N.Y.S.2d at 656-57, 70 N.Y.2d at 389 (barring a tort claim that was redundant of a contract claim).

With the foregoing authority in mind, for purposes of this motion we conclude that plaintiff has adequately pled that PrivatAir had a fiduciary relationship with Ross based on his allegation and description of an agency relationship with PrivatAir coupled with his claim that he both relied on PrivatAir's espoused expertise and over the course of their relationship had PrivatAir negotiate with Grafair on his behalf. *SeeFrydman & Co. v. Credit Suisse First Boston Corp.,* 272 A.D.2d 236, 237, 708 N.Y.S.2d 77, 79 (1st Dep't 2000) (holding that a fiduciary duty existed where bank provided plaintiff "with investment banking advice and other services, including conducting negotiations with ... on [plaintiff's] behalf ... in connection with the attempted acquisition" of a business); *seealso Wiener v. Lazard Freres & Co.,* 672 N.Y.S.2d 8, 15 (1st Dep't 1998) (holding that a fiduciary obligation has been adequately pled where *inter alia* the defendant assumed negotiations on behalf of plaintiff, where plaintiff relied on defendant's expertise).

### B. *Was The Fiduciary Duty Breached?*

*\*7* To find a fiduciary relationship through agency only begins the inquiry, which also requires identifying, amongst other things, the particular obligations owed. *SeeSEC v. Chenery Corp.,* 318 U .S. 80, 85-86 (1943). Under New York law an agent owes its principal fiduciary duties of good faith and

loyalty. *SeeSix West Retail Acquisition, Inc. v. Sony Theatre Management Corp.,* No. 97 Civ. 5499(LAP), 2004 WL 691680 at *19, (S.D.N.Y. Mar 31, 2004) (stating that all agents owe their principals "general fiduciary duties of good faith and loyalty"); *cf.Phansalkar v. Andersen Weinroth & Co., L.P.,* 344 F.3d 184, 200 (2d Cir.2003) (" Under New York law, an agent is obligated to be loyal to his employer and is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties") (citations and quotations omitted). Additionally, there is authority for the general proposition that a fiduciary is "responsible to undertake reasonable diligence" upon matters within the fiduciary obligation. *BNY Capital Markets, Inc. v. Moltech Corp.,* 99 Civ. 11754(GEL), 2001 WL 262675 at *8 (S.D.N.Y. Mar. 114, 2001). A fiduciary obligation, however, is "limited to matters relevant to affairs entrusted." *Rush v. Oppenheimer & Co., Inc.,* 681 F.Supp. 1045, 1055 (S.D.N.Y.1988); *BNY Capital Markets,* 2001 WL 262675 at *8 (stressing that a "fiduciary is only responsible to undertake reasonable diligence or give advice for the benefit of another upon matters *within the scope of the relation"* ) (emphasis in original, citations and quotations omitted).

PrivatAir's alleged breaches with respect to the contract language are on their face outside the confines of its fiduciary obligations. PrivatAir is affirmatively alleged to only possess expertise in " aircraft sales and acquisitions" and in "negotiating contracts for the purchase and sale of aircraft."Am. Compl. ¶ 6. PrivatAir is not a law firm. Plaintiff cites no authority which supports holding a non-lawyer to a special standard of care for conduct that is the province of attorneys, such as contract drafting and interpretation. Regardless of how plaintiff may have interpreted PrivatAir's abilities or representations, PrivatAir cannot be held liable for what is essentially a legal malpractice claim when it never held itself out to be an attorney. *SeeBNY Capital Markets,* 2001 WL 262675, at *8.

Ross also claims that PrivatAir breached its fiduciary duty by urging Grafair to make repairs to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 9

Not Reported in F.Supp.2d, 2004 WL 1837366 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

the Aircraft. Unlike contract drafting and interpretation, PrivatAir's charge to communicate with prospective airplane sellers was attended by fiduciary duties. Thus, it would be inappropriate to dismiss this particular claim of Ross's at this time. FN13

FN13. It is, however, appropriate to note that the authority which enables a portion of Ross's breach of fiduciary duty claim to survive contain affirmative allegations of active disloyalty and self-dealing. *See Frydman,* 708 N.Y.S.2d at 79; *Wiener,* 672 N.Y.S2d at 15. The absence of such claims here could make those cases distinguishable from the present one. Moreover, based on what has been presented to the Court thus far (in Ross's amended complaint, his opposition memorandum, and during oral argument), we are highly skeptical that Ross will be able to establish a breach of fiduciary duty sufficient to withstand summary judgment. For example, Ross will have to demonstrate that PrivatAir's statements to Grafair were actually unauthorized, a position which has yet been set out in any detail. But there is serious tension between Ross's claim that PrivatAir was his fiduciary, which depends in large part on PrivatAir possessing authority to negotiate on Ross's behalf, and the claim that PrivatAir had to seek permission from Ross before acting. It seems the more control Ross had over PrivatAir, the less PrivatAir can be considered a trusted and empowered fiduciary acting on Ross's behalf by virtue of its expertise as opposed to Ross's direction. Ross will also have to establish that PrivatAir's supposedly unauthorized actions actually caused the damage he claims. Again, based on the Court's current understanding of the allegations, this will be a challenge. This Court is not bound to Grafair's interpretation of PrivatAir's communications or the Grafair Agreement, which included specific provisions

defining the mechanics of acceptance, as well as an integration clause.

### IV. *Negligence Claim*

PrivatAir is alleged to have committed negligence for the same exact reasons PrivatAir is alleged to have breached its contract with and fiduciary duties owed to Ross. *See* Am. Compl., ¶ 42. The elements of a negligence claim under New York law are "(1) a duty owed by the defendant upon the plaintiff; (2) a breach thereof; and (3) injury proximately resulting therefrom." *Solomon v. City of New York,* 489 N.E.2d 1294, 1294-95 (1985); *see also Stagl v. Delta Air Lines, Inc.,* 117 F.3d 76, 79 (2d Cir.1997). In particular, Ross is accused of violating a duty to act with reasonable care and skill. *See* Am. Compl., ¶ 43; *see also* Opp. Mem., at 18. This allegation, framed as one for negligence, is subsumed by Ross's contract and fiduciary duty claims. Again, "a simple breach of contract is not to be considered a tort unless a duty independent of the contract itself has been violated. This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,* 521 N.Y.S.2d 653, 656-57, 70 N.Y.2d 382, 389 (1987) (citations omitted). The only possible sources of a duty of PrivatAir's to exercise reasonable care and skill in performing its contract with Ross are the contract itself, or from PrivatAir's fiduciary status. As such, plaintiff's negligence claim fails. *See, e.g., Seybert-Nicholas Printing Corp. v. MLP U.S.A., Inc.,* No. 92 Civ. 6143(RPP), 1992 WL 315643, at *1 (S.D.N.Y. Oct. 22, 1992).

### V. *Rule 11 Sanctions*

*8 Defendant's motion for Rule 11 sanctions is plainly deficient as a matter of procedure, and is therefore denied.

Rule 11 sanctions are appropriate only after the allegedly offending party has been afforded a remedial "safe harbor" period. Under Rule 11(c)(1)(A):
A motion for sanctions ... shall be made separately

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 10

Not Reported in F.Supp.2d, 2004 WL 1837366 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

from other motions or requests ... [and] shall be served as provided in Rule 5, but shall not be filed with or presented to the court unless, within 21 days after service of the motion ... the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected.

Here, Ross was not served with PrivatAir's Rule 11 motion twenty-one days prior to its filing. Instead, the Rule 11 motion, which was made as part of PrivatAir's motion to dismiss, was contemporaneously served on Ross and filed with this Court. Nor is the Court informed of any other pre-filing notice provided by PrivatAir to Ross substantially fulfilling the safe harbor requirement. In brief, Ross has been deprived of any opportunity to "withdraw [ ] or appropriately correct[ ]" the challenged matter, and therefore we will not consider the merits of PrivatAir's Rule 11 application. The motion is denied.

For the foregoing reasons, defendant's motion to dismiss is granted with respect to the breach of contract and negligence counts. With respect to the breach of fiduciary duty count, defendant's motion is granted except that it is denied with respect to Ross's allegation that PrivatAir urged Grafair to repair the Aircraft without Ross's knowledge or authorization. Defendant's motion for Rule 11 sanctions is denied.

By September 8, 2004, the parties are to confer about and submit for the Court's review a discovery and motion schedule that is prompt and targeted at the issues raised in footnote 13 of this Memorandum. Upon completion of this limited discovery the Court will entertain a motion for summary judgment from defendant.

IT IS SO ORDERED.

S.D.N.Y.,2004.
Ross v. FSG PrivatAir, Inc.
Not Reported in F.Supp.2d, 2004 WL 1837366 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.